# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **STORAGE CAP MANAGEMENT LP**, | |
| Plaintiff, | Case No. 2:19-cv-4328 |
| v. | Judge Graham |
| **SPARESPACE STORAGE, LLC,** | Magistrate Judge Jolson |
| Defendant. | |

## OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff's motion for partial summary judgment, Doc. 76. For the reasons that follow, Plaintiff's motion is **GRANTED**.

### I. Background

**A. The Parties**

This case arises from a trademark dispute between two players in the self-storage facility business. Plaintiff Storage Cap Management LP ("Storage Cap") is a self-storage property management company that provides services to self-storage facilities. Consalvo Dep. 9:19-22. These services include daily operation, marketing, and accounting. *Id.* at 12:6-10. Storage Cap also licenses its brand Store Space to the self-storage facilities it manages. *Id.* at 30:25-31:3. It provides branded signage, business cards, and brochures. *See id.* at 28:17-22.

Storage Cap began using the Store Space brand in February of 2018 with a self-storage facility in Bonita Springs, Florida. *Id.* at 27:7-11, 24:1-4. It has since expanded its management and branding to 61 self-storage facilities in 20 states across the United States. *Id.* at 30:12-21; Doc. 76-4.

1

Storage Cap uses its Store Space branding to market the self-storage facilities it manages and itself. Web-based marketing, including social media, is its primary method of attracting customers to the self-storage facilities it manages. *Id.* at 40:13-14, 54:11-18. It also uses some forms of print advertisement, such as advertisements on pizza boxes and place mats. *Id.* at 55:6-11. These forms of marketing are intended to reach local customers. *Id.* at 56:9-15. Storage Cap also markets its management services to self-storage facilities through advertisements in industry publications. *Id.* at 56:2-8.

Defendant SpareSpace Storage, LLC ("SpareSpace Storage") is another player in the self-storage business. It operates one facility in Maimi, Florida. Answer ¶ 3, Doc. 76-9. It owns the rights to SpareSpace Storage intellectual property, which it permits self-storage facilities owned by other companies to use. Pryor Dep. at 15:20-24. It acquired these rights in 2018 from a self-storage facility that has been in operation in Grove City, Ohio since 1982. *Id.* at 15:1-8; Doc. 76-9 at 6. SpareSpace Storage began operating its Miami Florida self-storage facility in 2020. *Id.* at 16:1-5. Its intention is to engage in the self-storage business using the SpareSpace Storage name across the United States. *Id.* at 65:8-17. SpareSpace Storage primarily relies on web-based marketing and sends postcard mailers to the geographic areas immediately around its facility. Doc. 76-9 at 5.

### B. Trademark Applications and Dispute

Both parties have filed trademark applications for their respective word marks and logos. These marks are reflected in the below table:

|  | Storage Cap's Marks | SpareSpace Storage Marks |
|---|---|---|
| Word Mark | Store Space | SPARESPACE STORAGE |

| Logo | STORE SPACE |  |

Storage Cap filed applications for its marks with the United States Patent & Trademark Office (the "USPTO") on May 30, 2018. Docs. 76-5, 76-6. The applications assert that the marks were first used for the rental of storage units on April 23, 2018. Docs. 76-5 at 2, 76-6 at 2. SpareSpace Storage filed a trademark application for its word mark on January 25, 2019, asserting it was first used for retail store services for products associated with self-storage and moving on July 24, 1984, and for rental of storage units on January 2, 1995. Doc. 53 at 4; United States Patent and Trademark Office, Trademark Electronic Search System (TESS) https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4807:3peyeh.2.1 (last visited September 27, 2022). SpareSpace Storage filed a trademark application for its logo on November 1, 2017 and the trademark was registered on June 2, 2020. United States Patent and Trademark Office, Trademark Electronic Search System (TESS) https://tmsearch.uspto.gov/bin/showfield?f=doc&state=4801:816moi.2.2 (last visited September 27, 2022).

On June 13, 2019, SpareSpace Storage filed Notices of Opposition with the Trademark Trial and Appeal Board ("TTAB") of the USPTO, opposing registration of Storage Cap's marks. Answer ¶ 14. In its Notices of Opposition, SpareSpace Storage alleged that it uses its marks in connection with the same or similar services as those provided by Storage Cap under its marks, and that the parties offer and sell their products to a similar class of consumers and through the same channels of trade. *Id.* at ¶ 15. SpareSpace Storage also alleged that Storage Cap's marks are confusingly similar to SpareSpace Storage's marks in terms of appearance, sound, meaning, connotation, and overall impression, and that Storage Cap's marks are likely to cause confusion, mistake, and deception as to an affiliation, connection, or association between SpareSpace Storage

3

and Storage Cap or as to the sponsorship or approval of Storage Cap's services and other commercial activities by SpareSpace Storage. SpareSpace Storage further alleged that potential customers are likely to believe that Storage Cap's services originate from, or are sponsored or approved by, SpareSpace Storage, and will damage SpareSpace Storage. *Id.* at ¶ 16.

On July 25, 2019, Storage Cap filed a Notice of Opposition with the TTAB opposing registration of the SpareSpace Storage word mark on the grounds that, among other things, (1) SpareSpace Storage had not used the word mark in interstate commerce under Section 1(a) of the Lanham Act, 15 U.S.C. § 1051(a) at the time it filed its use-based application; and (2) to the extent there is a likelihood of confusion between Storage Cap's marks and SpareSpace Storage's word mark, SpareSpace Storage's trademark rights (if any) are limited to a small geographic area within the State of Ohio. *Id.* at ¶¶ 25–26.

### C. Instant Case

Storage Cap filed a complaint on September 27, 2019 asserting two causes of action: (1) declaratory judgment on the issue of no likelihood of confusion and (2) declaratory judgment on the issue of priority of trademark rights. *See generally* Doc. 1. SpareSpace Storage filed an answer and counterclaim asserting causes of action for (1) declaratory relief and (2) trademark infringement. *See generally* Doc. 53.

On October 29, 2021, Storage Cap filed a motion for partial summary judgment moving this Court for an order granting summary judgment on its claim for a declaratory judgment of non-infringement and against SpareSpace Storage's counterclaim for a declaratory judgment of a likelihood of confusion as well as its counterclaim for trademark infringement. Doc. 76. Storage Cap's motion is fully briefed and ripe for adjudication.

## II. Standard of Review

Storage Cap moves for summary judgment under Federal Rule of Civil Procedure 56. Under Rule 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record, "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

A district court considering a motion for summary judgment "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Revis*, 489 F.3d at 279–80 (quoting *Anderson*, 477 U.S. at 251–52).

## III. Discussion

Storage Cap moves this Court for summary judgment arguing that the undisputed facts demonstrate there is no likelihood of confusion and that Defendant's trademark infringement counterclaim fails as matter of law.

5

"A trademark is a design used to identify and distinguish the goods of a person." *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) (internal quotation marks and citation omitted). The test for trademark infringement is the likelihood of confusion between the two marks. *Id.* (citing *Two Pesos v. Taco Cabana*, 505 U.S. 763, 780 (1992)).

The Sixth Circuit has adopted eight factors that are to be considered in determining the likelihood of confusion: (1) the strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in using the mark. *Id.* at 542-43. Not all factors are relevant in every case, nor do the factors modify the ultimate question of the likelihood of confusion. *Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 424 (6th Cir. 2017) (citation omitted). The factors are simply a guide to determine whether confusion is likely. *Id.* at 436 (citation omitted)

### A. Strength of SpareSpace Storage's Marks

The first factor is the strength of the mark upon which infringement is claimed. "The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from infringement, and, therefore, the more protection it is due." *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985).

There are two components to the strength of a mark – conceptual strength and commercial strength. *Progressive*, 856 F.3d at 428 (citing *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012)). The conceptual strength of a mark signifies the "placement of the mark on the spectrum of marks . . . ." *Id.* The spectrum of marks ranges from generic to descriptive to suggestive to fanciful. *Id.* (citing *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th Cir. 2002)). A generic mark is "one which is commonly used as the name or

6

description of a kind of goods." *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984). It cannot become a trademark. *Id.* A descriptive mark "specifically describes a characteristic or ingredient of an article." *Id.* It can become a valid trademark only if it acquires a secondary meaning by becoming distinctive of the applicant's goods. *Id.* A suggestive mark "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Id.* at 362-63. Suggestive marks can be trademarks without proof of a secondary meaning. *Id.* An arbitrary mark is "far enough removed from the merely descriptive not to be vulnerable to possible attack . . . .' *Id.* at 363.

The Court finds that SpareSpace Storage's marks are descriptive and, therefore, conceptually weak. The phrase "SpareSpace Storage" describes the service offered – storage in spare space. Indeed, this is the very reason the company was named SpareSpace Storage. Howard Pryer, an owner of SpareSpace Storage, explained in a deposition:

> Q: And what appealed to you about the name SpareSpace Storage?
>
> A: It's great.
>
> Q: What about it's great?
>
> A: It's short and simple and describes what our service is.

Pryer Dep. 38:14-19.

SpareSpace Storage argues that its marks are suggestive. It asserts that the phrase "spare space" "does not immediately evoke the idea of self-storage facilities." Doc. 80 at 6. But this ignores the fact that the word "storage" immediately follows "SpareSpace" in the word mark. This argument fails because SpareSpace Storage's marks use the phrase "SpareSpace Storage," not "Spare Space." *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004) ("The unit

of analysis in considering the strength of the mark is the entire mark, not just a portion of the mark.").

Commercial strength "depends on public recognition, or the extent to which people associate the mark with the product it announces." *Progressive Distribution Servs., Inc.*, 856 F.3d 416 at 430. The most persuasive evidence of commercial recognition is survey evidence. *Id.* (citation omitted). Short of a survey, proof of marketing can be sufficient to establish broad public recognition. *Id.* (citation omitted). "Conversely, proof that third parties have extensively used a trademark or similar trademarks in the relevant market may indicate that the trademark is commercially weak." *Id.* (citation omitted).

Storage Cap asserts that the SpareSpace Storage mark is commercially weak because third parties have used "identical 'SPARE SPACE' marks." Doc. 76 at 20. It asserts that there is a facility operating under the name and mark Spare Space Self Storage a mere 60 miles away from SpareSpace Storage's licensee's Grove City, Ohio facility. Doc. 76 at 20. Further, two other facilities operate under similar names – a Spare Space Self Storage in Oshkosh, Wisconsin and a Spare Space in Valparaiso, Indiana. Doc. 76 at 21. But Storage Cap leaves unaddressed whether these facilities are within "the relevant market." [1]

SpareSpace Storage has presented no evidence to suggest that its marketing has established broad public recognition or that it retains public recognition despite other self-storage facilities using similar names and marks. As there is no evidence that SpareSpace Storage's marks carry public recognition, the Court concludes the marks are commercially weak. *See AGS Holdings, Inc.*

---

[1] Storage Cap's argument is in apparent conflict with its position, discussed later, that the market for self-storage facilities is purely local. Assuming arguendo that Storage Cap is correct and self-storage facilities do cater only to the local community, it is irrelevant that a few facilities well beyond the bounds of the community go by the same name.

*v. Custom Personalized Lawn Care Corp.*, No. 20-10873, 2022 WL 830607, at *9 (E.D. Mich. Mar. 18, 2022) (finding the nonmovant's inadequate evidence of the public's recognition of its mark supports the conclusion that the mark is commercially weak). The first factor favors finding no likelihood of confusion.

### B. Relatedness of Goods

Confusion of similar marks is more likely when the parties offer the same goods or services. *Audi AG*, 469 F.3d at 543 (citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*, 109 F.3d 275, 282 (6th Cir. 1997)). The parties agree that they offer related services. Docs. 76 at 22; 80 at 7. Therefore, the second factor favors finding a likelihood of confusion.

### C. Similarity of Marks

"Similarity of marks is a factor of considerable weight." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 283. Courts examining the similarity of marks consider pronunciation, appearance, and verbal translation. *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988). The similarity of marks must be gauged by their overall impressions, not individual features. *Daddy's Junky Music Store*, 709 F.3d at 283. Courts are to consider whether either mark would confuse a consumer who did not have both marks before her and had only a vague impression of the other mark. *Id.* (citation omitted).

The logo marks STORE SPACE and SpareSpace STORAGE are dissimilar. They are entirely different in appearance. The Store Space logo uses one line of text, an illustration of a common place lock, and no specific colors whereas the SpareSpace Storage logo uses two lines of text, a unique geometric figure somewhat suggestive of a lock, and an orange and blue color design. The overall impressions left by these logos do not lead to confusion. Indeed, the only similarity is that

9

both marks use the word "space." The great number of differences reduces the likelihood that a consumer would confuse the marks.

The word marks "Store Space" and "SpareSpace Storage" are also dissimilar. They differ in pronunciation, appearance, and verbal translation. Store Space is a noticeably shorter mark, consisting of two words instead of three, and is comprised of half the numbers of syllables. *See Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (holding the marks "Little Caser" and "Pizza Caesar USA" are dissimilar because "the addition of the acronym 'USA' to the latter mark almost doubles the number of syllables and heightens the distinction."). The third factor favors finding no likelihood of confusion.

### D. Evidence of Actual Confusion

Evidence of actual confusion is the strongest proof of likely confusion. *Kibler v. Hall*, 843 F.3d 1068, 1078 (6th Cir. 2016) (citing *Frisch's Rest., Inc.*, 759 F.2d at 1267).

#### 1. The Lack of Evidence of Actual Confusion

Neither party presents real-world evidence of actual confusion. Storage Cap asserts that "where there is no evidence of actual confusion, the factor weighs in favor of summary judgment on no likelihood of confusion." Doc. 76 at 28. It is well established that due to its difficulty to obtain, the lack of evidence of actual confusion does not generally weigh in favor or against the likelihood of confusion. *See, e.g., Daddy's Junky Music Store, Inc.*, 109 F.3d at 284; *Audi AG*, 469 F.3d at 543. The lack of evidence of actual confusion is only "perhaps" probative "when the particular circumstances indicate such evidence should have been available." *Id.*

Storage Cap believes that the Sixth Circuit changed course in *Gray v. Meijer Inc.*, 295 F.3d 641, 648 (6th Cir. 2002). In *Gray*, the Sixth Circuit reviewed a district court's conclusion that the absence of evidence of actual confusion favors the movant. *Id.* at 648. The Sixth Circuit explained

10

that "whether the Court says that this factor favors [the movant] or neither party is of no import . . . ." because the nonmovant has the burden to "identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Id.* (quoting *Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999)). Plainly, *Gray* addressed an issue of burdens which rendered the district court's balancing of the factor of actual confusion inconsequential. It did not find that the lack of evidence of actual confusion supports a finding in favor or against the likelihood of confusion.

### 2. Evidence of No Confusion

Storage Cap offers a consumer survey conducted by marketing expert Sarah Butler, managing director of NERA Economic Consulting, to support the proposition that there is an "extremely low likelihood of confusion." Doc. 76 at 29.

Butler conducted a survey of 413 consumers who have rented a self-storage facility in the last 12 months or who plan to in the next 12 months. Butler Report at ¶ 8. The respondents were adults 18 years and older who reside in the United States. *Id.* at ¶ 23. To include a greater number of consumers located near SpareSpace Storage's facilities, Butler intentionally oversampled adults who lived within 50 miles from Miami, Florida and Grove City, Ohio. *Id.* The survey was conducted in a double-blind fashion, with neither the staff nor the respondents aware of the survey's sponsor or purpose. *Id.* at ¶ 27(a).

Respondents were provided a list of features and asked to choose which were reasons they rented a storage unit from a facility. *Id.* at ¶ 30. The list included location of facility, cleanliness of facility, facility security, size of storage space offered, price of rental, the lack of a required long-term rental commitment, name or brand of facility, familiarity of facility, a discount or special offer, color of storage unit doors, and climate-controlled storage units. *Id.* If respondents selected

11

multiple features, they were asked which feature was most important when selecting a facility. *Id.* at ¶ 31.

The respondents answered that they select a facility for the following reasons:

|  | Current Renters | | Future Renters | |
| --- | --- | --- | --- | --- |
|  | Count | Percent | Count | Percent |
| Price of rental | 196 | 72.9% | 125 | 86.8% |
| Location of facility | 195 | 72.5% | 109 | 75.7% |
| Size of storage space offered | 183 | 68.0% | 103 | 71.5% |
| Cleanliness of facility | 152 | 56.5% | 105 | 72.9% |
| Facility security | 140 | 52.0% | 97 | 67.4% |
| Climate controlled storage units | 107 | 39.8% | 77 | 53.5% |
| No long-term commitment required | 94 | 34.9% | 67 | 46.5% |
| A discount or special offer | 67 | 24.9% | 58 | 40.3% |
| Familiarity of facility | 64 | 23.8% | 24 | 16.7% |
| Name or brand of facility | 38 | 14.1% | 19 | 13.2% |
| Color of storage unit doors | 18 | 6.7% | 7 | 4.9% |
| None of these | 0 | 0.0% | 1 | 0.7% |
| Don't know / unsure | 0 | 0.0% | 0 | 0.0% |
| **Number of Respondents** | 269 | | 144 | |

*Id.* at ¶ 55.

The respondents were then randomly assigned to either Study 1 or Study 2. *Id.* at ¶ 34. Study 1 focused on SpareSpace Storage while Study 2 focused on SpareSpare Storage's licensee. *Id.* The respondents of each study were randomly assigned into either the Test Group or the Control Group. *Id.* at ¶ 35. The respondents assigned to the Test Group viewed the website homepages for SpareSpace Storage (Either the main or licensee's page depending on the study), Store Space, Public Storage, CubeSmart, and SpareFoot. *Id.* at ¶ 35, 45. The respondents assigned to the Control Group viewed the same homepages, except that the Store Space homepage was edited to have the marks "Store Space" and [STORE SPACE] replaced with "More Space" and [MORE SPACE].[2] *Id.* at ¶¶ 48, 49.

---

[2] Storage Cap's trademark application does not include a particular color pattern. The colors selected for the Control Group logo reflects the colors of the logo on Storage Cap's website.

The respondents were asked three questions about the webpages: (1) whether they thought any of the webpages were from the same company or brand of storage facility shown in SpareSpace Storage's webpage, (2) whether any of the webpages were associated or affiliated with the company or brand of storage facility shown in SpareSpace Storage's webpage, and (3) whether any of the webpages were licensed or received approval from the company or brand of storage facility shown in SpareSpace Storage's webpage. *Id.* at ¶¶ 38, 40, and 42. If a respondent answered affirmatively, they were asked to elaborate. *Id.* at ¶¶ 39, 41, and 43.

The purpose of the Control Group test was to account for respondents correlating companies for reasons other than their trademarks, such as webpage layout, font, pictures, and colors. Butler explained:

> A survey designed to measure whether the use of a particular mark causes consumers to be confused as to the source of, affiliation or association, or permissions associated with a brand or company may also inadvertently include the perceptions of respondents that are unrelated to the specific stimuli being tested. Responses that are unrelated to the specific words or marks being tested threaten the validity of the confusion estimates and should be eliminated from the final calculation. To measure the extent to which such responses are affecting the desired estimate, survey researchers typically also measure the perceptions of respondents using a Control stimulus with a separate group of individuals."

*Id.* at ¶ 48 (footnote omitted). She believes that the respondents who answered that the More Space webpage is associated with the SpareSpace webpage must have reached that conclusion for reasons other than the marks.

Butler estimated the overall confusion by tabulating the number of times a respondent answered "yes" to each storage facility for any of the three questions presented. *Id.* at ¶ 63. If a respondent responded "yes" with regard to the same storage facility for multiple questions, it was counted as one affirmative response. *Id.* Butler then calculated net confusion by subtracting the Test Group's percentage (those who found Store Space to be associated with SpareSpace Storage)

13

from the Control Group's percentage (those who found More Space to be associated with SpareSpace Storage) and came to the following results:

| Response Option | STUDY 1 | | | | | STUDY 2 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Test | | Control | | Net | Test | | Control | | Net |
| | Count | Percent | Count | Percent | | Count | Percent | Count | Percent | |
| STORE SPACE | 25 | 22.7% | 15 | 15.3% | 7.4% | 26 | 26.5% | 28 | 26.2% | 0.4% |
| PUBLIC STORAGE | 34 | 30.9% | 26 | 26.5% | | 22 | 22.4% | 19 | 17.8% | |
| CUBESMART | 35 | 31.8% | 23 | 23.5% | | 21 | 21.4% | 17 | 15.9% | |
| SPAREFOOT | 20 | 18.2% | 27 | 27.6% | | 21 | 21.4% | 24 | 22.4% | |
| Total Respondents | 110 | | 98 | | | 98 | | 107 | | |

*Id.* at ¶ 63. She concluded that:

> My survey demonstrates that there is no likelihood of confusion – the net estimated confusion is less than 10% and the rates are not statistically significant; i.e. respondents in the Control Group who are shown the Store Space website without the mark are just as likely to guess that there is some association with SpareSpace. Moreover, only four respondents make any reference to a similarity in names when describing why they associated SpareSpace and Store Space. Additionally, respondents are more likely to believe there is a connection between SpareSpace and Public Storage than they are to associate SpareSpace and Store Space. Finally, my results demonstrate that less than 15% of current and future self-storage renters indicate that the name of a storage facility is important to them when selecting a storage company. Taken together, the survey results demonstrate that consumers will not confuse Store Space and SpareSpace storage facilities.

*Id.* at ¶ 65.

The Court finds that this methodology is flawed. First, the Control Group testing is imperfect. Butler believes the Control Group respondents who found More Space to be related to SpareSpace Storage must have done so for reasons other than the marks. However, it is possible that the respondents simply found the More Space mark and modified logo themselves to be confusingly similar to the SpareSpace Storage mark and logo. Considering the similarity between Store Space and More Space, it is unsurprising that the number of respondents who believed Store Space is associated with SpareSpace Storage is nearly identical to the number who believed More Space is associated with SpareSpace Storage.

14

Second, the survey did not separately test each of the marks at issue. This case involves four marks – two word marks and two logos. The webpages each contained one set of word marks and logos. Respondents to the survey could have based their answers on the word marks, the logos, or both. The survey does not provide a way to extrapolate which, if any, of the marks caused or prevented confusion.

Finally, the survey was an unrealistic side-by-side study. The purpose of the likelihood to cause confusion analysis is to determine whether the marks may confuse consumers in real-world situations. *See Daddy's Junky Music Store, Inc.*, 109 F.3d at 283. While it is possible that consumers may compare self-storage websites side-by-side, it is more likely that they judge their familiarity with a self-storage facility based on their recollection of previous encounters. Therefore, having respondents compare the details of multiple websites in determining whether companies are related does not accurately demonstrate whether any of the marks at issue in this case are likely to confuse consumers in real-world situations.

Storage Cap argues that a side-by-side survey is permissible in situations where, as here, the marks are not well known by the average person. It cites in support a district court opinion out of the Middle District of Florida -- *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 616CV2001ORL31GJK, 2019 WL 913374 (M.D. Fla. Feb. 25, 2019), aff'd, No. 19-10771, 2021 WL 4438518 (11th Cir. Sept. 28, 2021). In addition to not being binding authority, *Superior Consulting Servs., Inc.* is distinguishable. There is no indication that the survey in *Superior Consulting Servs., Inc.* had other methodological errors. Here, on the other hand, the Court is presented with a survey that employed a faulty control test and failed to separate and individually test each of the marks at issue. Given these other methodological errors, the fact that the survey

was done in a way that speaks little to how consumers would interact with the marks in the real world compounds the unreliability of the survey results.

As Butler's survey is replete with methodological errors, the Court finds that it is not probative of the likelihood of confusion. *See Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518 (6th Cir. 2007) ("Where a survey presented on the issue of actual confusion reflects methodological errors, a court may choose to limit the importance it accords the study in its likelihood of confusion analysis.") (citation omitted). In sum, as there is no evidence of actual confusion, the fourth factor is neutral.

### E. Marketing Channels Used

Whether the marketing channels used increases the likelihood of confusion depends on "the similarities or differences between the predominate customers of the parties' respective goods or services and whether the marketing approaches employed by each party resemble each other." *Audi AG*, 469 F.3d at 543 (cleaned up). Simultaneous use of online marketing supports a finding of likely confusion if: (1) the parties use the internet as a substantial marketing channel; (2) the parties use their mark with web-based projects; and (3) the parties marketing channels overlap in other ways. *Kibler*, 843 F.3d at 1079.

Here, there is overlap in the type of customers both parties are soliciting. Both companies desire to attract customers looking for a self-storage facility. Despite this, Storage Cap argues that there is no overlap in customer base. It asserts that self-service storage facilities market only to their surrounding communities. As Storage Cap does not run a facility near SpareSpace Storage's facility, it asserts there is no overlap is customer base. This argument fails for two reasons. First, Storage Cap presents no evidence that SpareSpace Storage's customer base consists only of

16

individuals near its facility. Rather, an interrogatory suggests that SpareSpace Storage limits only its print advertisements to the surrounding areas:

> [SpareSpace Storage] markets its products and services to all persons, including individuals and business, who need or may consider using self-storage, purchasing storage insurance, and/or purchasing products associated with self-storage and moving. The majority of customers who rent from SpareSpace Storage find the business through various online channels including but not limited to: the company website, listing location pages on Google, Yelp, Bing, as well as map applications. Additionally, third party aggregator websites deliver some customers. Postcard mailers are used for the immediate geographic areas.

Doc. 76-9 at 5. Second, Storage Cap has two self-storage facilities around 20 miles from SpareSpace Storage's licensee's Grove City, Ohio location – one in Columbus, Ohio and one in Hilliard, Ohio. Doc. 76-4.

The parties do not address whether their marketing approaches resemble each other's, and the record contains inadequate information for the Court to make this determination. Storage Cap engages primarily in web-based marketing including pay-per-click, search engine optimization, search engine marketing, and social media." Consalvo Dep. 54:11-18. SpareSpace Storage utilizes its website; listings on Google, Yelp, Bing, and map applications; and third-party aggregator websites. Doc. 76-9 at 5. Questions of fact remain which preclude the Court from comparing these marketing approaches. For example, the record is silent on how frequently each marketing tool is used, the details of how they are used, and whether they utilize the party's marks. Therefore, the Court cannot weigh the factor of the marketing channels used.

### F. Degree of Customer Care

The purchase of some goods and services, especially those which are expensive or unusual, prompt customers to exercise a greater degree of care. *See Daddy's Junky Music Store, Inc.*, 109 F.3d at 285. For example, home buyers exercise greater care when selecting their real estate brokers than customers do in selecting their fast-food meal. *Id.* (citations omitted). A customer

17

exercising a higher degree of care is often less likely to confuse trademarks. *Id.* However, if the trademarks are very similar, even a high degree of care will only slightly decrease the likelihood of confusion. *Id.* at 286.

The parties do not dispute that customers of self-storage services exercise a high degree of care. *See* Docs. 76 at 32; 80 at 13. Thus, the sixth factor weighs against finding a likelihood of confusion.

### G. Intent in Selecting the Mark

Evidence that the purported infringer chose its mark to confuse consumers about the source of the party's products creates an inference of a likelihood of confusion. *Kibler*, 843 F.3d at 1081 (citing *Therma-Scan*, 295 F.3d at 638). Circumstantial evidence of intent is sufficient, including evidence that the purported infringer knew of the other trademark while using its mark. *Id.*

The parties agree that there is no evidence that Storage Cap chose its marks to confuse consumers about the source of its services. Therefore, this factor is neutral. *See id.* (finding that the factor of intent in selecting the mark is neutral where "the record prevents a reasonable jury from inferring intent.").

### H. Likelihood of Expansion

"A strong possibility that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Daddy's Junky Music Store, Inc.*, 109 F.3d at 287 (cleaned up).

SpareSpace Storage argues that both it and Storage Cap will continue to expand, creating a strong possibility that direct competition and marketing will arise. Storage Cap currently has 65 facilities in 20 states. Consalvo Dep. 30:12-21; Doc. 76-4. SpareSpace Storage currently has only one facility in Miami, Florida and one licensee in Grove City, Ohio, though it intends to expand

18

throughout the United States. Pryor Dep. 65:8-17. However, the likelihood of expansion causing direct competition is merely speculative. SpareSpace Storage offers no evidence to support that its ambitions to expand will become a reality. Without evidence to support SpareSpace Storage's expansion plans, this factor is neutral as to the likelihood of confusion. *See Maker's Mark Distillery, Inc.*, 679 F.3d at 424 ("a finding of little evidence of expansion plans is accorded little to no weight . . . .").

### I. Balance of Factors

On balance, the factors compel the conclusion that there is no likelihood of confusion among the parties' marks. The two most important factors are the strength of the mark and the similarity of the marks. *Maker's Mark Distillery, Inc.*, 679 F.3d at 424. These factors strongly indicate that there is no likelihood of confusion. The remaining factors are neutral or insignificant here.[3]

### IV. Conclusion

For the reasons stated above, the Court finds that there is no likelihood of confusion among the parties' marks. Storage Cap's Motion for partial summary judgment, Doc. 76, is **GRANTED**.

**IT IS SO ORDERED**.

s/ James L. Graham  
JAMES L. GRAHAM  
United States District Judge

DATE: October 7, 2022

---

[3] The Court acknowledges the questions of fact remain regarding the factor of marketing channels used. Summary judgment is still appropriate because SpareSpace Storage, the nonmovant, has not met its burden in showing that this issue of fact is material. *Mktg. Displays, Inc.*, 200 F.3d at 934 ("the nonmoving party's burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive to the likelihood of confusion issue."). Even if the marketing channels overlap, Store Space's marks' commercial weakness and lack of similarity to Store Cap's marks merit the conclusion that there is no likelihood of confusion.